Hear ye, hear ye, hear ye. The United States Court of Appeals for the 11th Circuit is now open according to law. God save the United States and this honorable court. Good morning everyone and welcome to the 11th Circuit for the last day of our sitting. We again, Judge Marcus and Judge Carnes and I are pleased to welcome you here. We know that these are unusual circumstances but we're glad that we can be together in this way at least. We've chosen three cases with all very simple procedural postures today to just get us started cleanly on a Friday. So I guess obviously let's get started first with Tolar v. Marion Bank and Trust. We'll hear first from Mr. Guerrier. Am I pronouncing that correctly? Guerrier. Guerrier. Mr. Guerrier, you've reserved three minutes for rebuttal but please keep track of your own time. Thank you. Certainly will. Thank you, Your Honor. My name is Charles Guerrier and I represent the appellants Gregg Reed and Andrew Tolar in this case. Because of the limited time, I'm going to limit my argument to three particular items. Of course, if the court has any other questions for me, I'll be glad to respond them. I'm going to talk about the zone of interest circuit, the causation question on which the district court ruled, including the impact of the Bostock decision from the Supreme Court, and then the propriety of including Bradley Aarant as a defendant in this case. So let me start with the zone of interest case. Again, this is a retaliation case where the appellants are alleging that Marion Bank, in an effort to retaliate against one of its employees, Reagan Livingston, because she complained about sexual harassment, took adverse actions against her family members. Now, as the Seventh Circuit has said, retaliatory acts come in an infinite variety. And so the question we have to decide here is whether or not retaliatory acts taken against an employee that caused harm to a non-employee makes that non-employee an aggrieved individual within the meaning of Title VII and its anti-retaliation provisions. To help us in that, we of course have the decision in Thompson from the Supreme Court. But I believe we need to start, before then, we need to start with the Supreme Court's decision in Burlington Northern v. White. Because there, the Supreme Court concluded that the anti-retaliation provision of Title VII does not confine the actions or harms it forbids to those that are in the workplace. The court specifically recognized that retaliatory acts, that an employer can engage in retaliatory acts outside of the workplace, and those harms can occur outside the workplace. So that you can't limit your inquiry to what's going on within the workplace. Now, what does that mean, then, if an employer, as in Thompson, decides to retaliate against an employee who files a charge of discrimination by firing that employee's fiancee, as was the case in Thompson? Well, certainly... Mr. Guerrero, this is Judge Karnes. Yes. It's interesting, these cases, and of course we have to rely on them. But the question is, the Supreme Court, Justice Scalia, I believe, writing, said we don't know how far we're going to go with this thing. Simmons is against your position. It's not binding. It's the Fifth Circuit. But Simmons would indicate that these being third parties, this goes way beyond what the retaliation provision was envisioned would cover. I assume you disagree with Simmons. Could you tell me why? Yes. I think Simmons, one, fails to even mention Burlington Northern v. White, and the reality that retaliatory acts can occur outside the workplace. And so it doesn't consider that range of harm that can occur between an employer terminating a fiancee, which was in Thompson, and the absurd result that Justice Scalia notes in Thompson about a stockholder, because there is a broad range of harms that occur in the middle. And one of the ways to help sort of answer that question is to go back and look at the Lexmark decision from the Supreme Court. Why? It may not account for this, that, or the other. Why do you think Simmons is wrong? I think Simmons is wrong because it failed to recognize that an employer who retaliates against its own employee by taking an adverse action against the third party has harmed that third party as the means of retaliating against its own employee. And that, if indeed, remember in Thompson, the Supreme Court said that Ms. Regalado, who was the person who So she could bring a retaliation claim because of the firing of him. But can she collect for the harm suffered by him? And it's not clear that she can get the back pay that he lost by being fired, even though the act of retaliation was directed at him. So the question is, how do we allow employers to impose harm on third parties as a means of retaliating against their employee without any consequences? So this isn't a situation where we've got some ripples down the road, like the stockholder situation. This is much more direct. So the example would be Okay, finish your example because I've got another question. The example would be, suppose Marion Bank decided the way they're going to retaliate against Ms. Livingston is to burn down her family's home. According to Simmons, that would be fine, that her family members would have no cause of action other than perhaps some tort, but no Title VII cause of action against the bank for doing that. Let me ask you this. We're talking about ripples. One part of your argument is that your clients owe the bank a great deal of money. They were in default. The bank tried to collect some of the money, as banks often will do. And I guess your argument would be that if you owe a lot of money to the bank, you can't pay it. The best strategy on that is to get a relative hired, have that relative get fired, and sue the company. And then it seems to me what you're saying is sort of a get-out-of-jail-free card. Then you don't have to pay your money back. Does that make any walking around sense to you at all? Well, that wouldn't make any sense, but that's not the facts in this case. Those are the facts are, Greg Tolar did have a line of credit with the bank. He was not in default in that line of credit. That his daughter gets fired for complaining internally for sexual harassment. Soon thereafter, Greg Tolar and his wife go to speak to the bank saying, you really need to do an investigation of this and keep my daughter's insurance at least. They at that point say, don't we have business with you? A clear suggestion that if his daughter proceeds with a charge, they will cut off business. They then cut off his business. And then a substantial period of time after that is when Greg Tolar was unable to pay his debts, in part because the bank had cut off his business, not only from the bank, but had not approved him as a lawyer who's allowed to do any closings where the bank is going to be financing that loan. This is Judge Grant. Why isn't the bank's response to that situation, setting aside even the zone of interest issue, that they don't want their lawyer involving himself in matters outside of his legal representation of the bank? Why isn't that the better reading of the bank's response to him inserting himself into that situation? Well, one, he was not an employee of the bank, as it's very clear. He had a practice. So the question is whether one client can limit a lawyer's practice in another area. That would be a question as to whether any lawyer would let a client limit their practice. But that's not what happened here, of course, because the bank continued to use Mr. Tolar to close and finish up some work he was doing with them. And indeed, at no time until after the litigation started, is there any indication that they were concerned about the scope of Mr. Tolar's practice or whether he was representing his daughter? There is certainly a question and dispute as to whether Mr. Tolar and his wife showed up at the bank to plead their daughter's case, whether he was there as her lawyer. As I point out in our briefs, I've never in my career taken my spouse to a meeting with a client. And let me say, obviously, we don't have before us what actually occurred, but for purposes of argument, let's say that his daughter's allegations were true. I certainly understand his desire as a father to be there and help his daughter. But I think I can also see how the bank would see their lawyers' interactions with them as an adverse father, even if he wasn't his daughter's attorney. I can see how they would see that interaction as not likely. Well, that's a possibility. Whether a jury would conclude that, well, two minutes remain in dispute. And again, what that goes... Mr. Greer, this is Judge Carnes. I mean, isn't it just sort of basic understandings and representation of clients that if you're representing a particular client, and it turns out you decided you're going to sue or get involved in suing that client, I think most lawyers understand something has to give way. I don't think there's any expectation that you can be suing a client on another matter at the same time that you're representing the client on a different matter. That is something that typically in relationships, you just don't do. Absolutely. And that's why Mr. Tolar did not represent his daughter in the litigation, and she got other counsel. In the meeting, he tells them, almost threatens them, you know, legal actions coming. That sounds like a person who's a lawyer who's saying something the way a lawyer might say something. That may be, but talking like a lawyer doesn't mean he's there as a lawyer. But that goes also to whether that is actually what motivated them. Didn't they have reason to believe that he was representing his daughter? We don't know. We have... I see my time is about to finish. We know that this issue about representation came up much later. Initially, they said they stopped using him because he had defaulted on his loans, and that, of course, is false. But even if that was their concern, it does not explain why then they kept him off the list of attorneys who are approved to do closings for other individuals, not the bank. And that's one thing to say, I don't want you doing my work because you're adverse to us. But to then say, and I don't think you should be allowed to do any work for any of my customers who may be trying to get a loan through me. And that's what they did. So I don't think that argument flies, but I see my time is up. Counselor, your time has expired. Thank you. We will now hear from Ms. Willis for Merriam-Bancon Trust. May it please the court, this is Catherine Willis. I represent Merriam-Bancon Trust in this appeal. I have listened to the questions the court has had, and I have a couple of points I'd like to make and, of course, address any of the court's questions as well. First of all, I think we have to be clear here. Simmons, in the discussion of Simmons, anticipated, I think, this very situation. And notably, Simmons pointed out and addressed Thompson and the very important distinction in Thompson that the two individuals, the fiance and the individual plaintiff, were actually employees. And I think Simmons not only goes to the issue of are you a person of greed, but if we get into the zone of interest, does that zone of interest actually fall within what the statute, Title VII, is designed to protect? Yeah, fully acknowledge that Burlington Northern does get into conduct outside the workplace, but in my mind, that's more of an example of, you know, I've complained about a fellow employee harassing me and my tires get slashed in the parking lot. That may not be something that happens in the workplace, but it happens in the context of work or from a co-worker or from a co-employee. What if she had, this is Judge Grant, what if she had complained about sexual harassment and then her father's tires got slashed in the parking lot? The way that I read, Your Honor, the way that I read Simmons, I don't know that it goes that far because if it's slashed in the employer's parking lot, I don't know how far that goes. But what I understand Simmons to be saying is, let's get back to the basics of Title VII. Let's get back to what it's designed to protect, which is terms and conditions of employment, which is, in fact, the interest of what we are looking to protect. And in Simmons, that was something as basic as access to an office by a third party. And Simmons notes the purpose of Title VII is to protect employees from their employers' unlawful actions. But I think what Judge Grant has said and Simmons has personally said that we're certainly not bound by it. Would your rule give employers an easy end run around the statute if they could simply take whatever retaliatory acts they wish against a person's family members? Sometimes laws don't apply to everything that it might feel like they should apply to. But are you saying that there's nothing that a company could do to someone's family members on a retaliatory basis that would lead to a claim of this nature? No, I am not saying that. And I am not saying that that is what Simmons anticipated. But I think as the court correctly and previously noted, the question becomes, as Justice Scalia notes, how far does this go? And in this particular case, Your Honor, it is much, much too far as how far it goes. And particularly with regard to the intervening causes, which is Greg Tolar's own conduct. This court has long recognized, even if we are looking at this in an employment context, if an employee takes, you know, if an employee makes a complaint one day and then shows up to work drunk the next day and the company has an alcohol and substance abuse policy, that the employee's conduct broke the criterion. Even with a non-employee, never an employee, Greg's own conduct indicating that he was going to be adverse to the bank, eventually defaulting on loans, representing he didn't have assets, and then changing the terms of a trust. Those particular actions on his part break any sort of chain of causation and make this case a little bit unique and different in that regard, even if we look at it in the context of employer-employee, which is very difficult to do because otherwise I think the result would be, Your Honor, that no client, no company would ever have the ability to terminate a relationship, an attorney-client relationship with their attorney because it kind of gets into that absurd result that Justice Scalia goes into. It would deprive clients of that particular right for fear of retaliating against me. Let's suggest the hypothetical a little bit. Let's say that a husband and wife are both employed at a particular business and the wife claims that sexual harassment has occurred at the business and the next day they fire the husband. Does Title VII reach that context? And I understand that's not what's going on here, but does Title VII reach that context? And so I'm going to restate it to make sure I understand it correctly, but just for my own edification, if the wife files, husband and wife work for the same employee, wife files a complaint of sex harassment, the next day the husband is fired. Well, yes, that could possibly be covered by Title VII. Now if the husband went out and the accused supervisor or got into a fight or had some intervening action, I don't know that the causation required for establishing retaliation, the but-for and all of that would be met. And as Your Honor noted, that wasn't the situation here because we didn't have someone that had ever been an employee when we're talking about, yes, Ms. Livingston won, of course. I'm noting that for the record, but her father, Mr. Tolar, was not nor were her brother or her uncle. And in that regard, if the court will allow me, I do want to clear up a couple of things in the appellant's argument that I don't think are accurate representations of the record. First of all, with regard to the adversity issue in the meeting with the bank board member, as an initial matter, there is evidence in the record that Mr. Tolar testified in a previous case that, quote, we would be filing an EEOC charge on her behalf, close quote. In any event, the district court correctly found, and there's no evidence in the record suggesting otherwise, that the bank certainly understood that Mr. Tolar was taking an adverse position to them. Now, whether that's, you know, as a lawyer or a father, we would be filing an EEOC charge on her behalf certainly suggests lawyer. But I think it could even go to, you know, I'm her dad and I'm adverse to her interest. And even if we think of this in an employment context, let's set Simmons and all of these things aside, if we think of this in an employment context, that this court's been clear that a good faith, reasonable belief on behalf of an employer that something may be true or may be accurate is enough to act on, even if it's later disavowed, even if that reason is later disavowed, or it doesn't play out that way. I also wanted to point that with regard to this list, this customer list that Appellant's Counsel referred to, the evidence in the record is clear that yes, there was a list. And the list that eventually came out did not include Mr. Tolar's name. However, that list was never published. It was never made available to third parties or those in the community. And that list did not foreclose an individual client or customer. It was really for internal use only. But it didn't, if I wanted to go and close a loan or do a real estate transaction, there's absolutely no evidence in the record that Miriam Banks said vis-a-vis this list, Mr. Tolar could not or would be prohibited from doing so. I also want to point out here that it's, you know, what's really sort of troublesome here too is that there is no attorney or no, there's no attorney that's been identified who was adverse for whatever reason. Maybe they go and represent a borrower in the community in an adverse way to the bank who the bank did not cease to send work to, legal work to. Likewise, there's plenty, there's evidence in the record that the bank had, as this court previously noted, as banks will often do, collected on loans and in fact filed fraudulent transfer actions and objected to bankruptcies when those bankruptcies were believed to be assets and a payment could be made. So I do want to be clear that I think regardless of how we look at the employment relationship, the scope of whether this is even within the zone of interest of Title VII, you know, causation forecloses this whole thing and most especially the intervening acts of Mr. Tolar that eventually played out. And with that, unless the court has any further questions, I will be happy to turn it over to Ms. Wheeler for the Bradley A. Rant Counsel for her time. I have just one question. I have one question, Judge Carnes, just a matter of curiosity. I don't think it's all that pertinent. What's the status of the daughter's action she filed in the EEOC charge? What's the status of her sexual harassment claim against the bank? The status of that action, Judge Carnes, is that it was eventually filed as a federal court lawsuit and it was eventually, it came to a resolution. Obviously, I was not, my firm was not involved in that, but that's been clear from, I think, procedurally through the course of this particular litigation that we're here about today. All right. It's not pending anymore? No, Your Honor, it's not. All right. Thank you. Thank you, and I appreciate the time, and I will now, unless the court has any further questions, turn it over to Ms. Wheeler, who represents Bradley A. Rant. Thank you. Ms. Wheeler. Good morning, and may it please the court. My name is Jennifer Wheeler, and I represent the Bradley Law Firm. All of the arguments that Ms. Willis made about the employer-employee relationship also apply to Bradley, except that Bradley's a step further removed. Not only did Bradley not employ Ms. Tolars, they also did not employ Ms. Youngblood. They're simply the law firm that represented Marion Bank in the series of lawsuits that the parties have been referencing. Mr. Grier repeatedly relied on Thompson. In that case, both the employee and her husband who was fired were both employees of the same company. This court distinguished Thompson in 2013 in Underwood and said that a Title VII plaintiff is required to show that the employer retaliated against his own employee for engaging in protective conduct. Bradley has cited Underwood throughout the litigation, and the district court has relied on that case, and the Tolars have never once addressed it, including today. He may have run out of time, but did not address Bradley at all in his oral argument today. Instead, the Tolars claim that Bradley is liable as an agent of Marion Bank, as a joint employer, or as a single employer because it employs more than 15 of its own employees. Each of those theories still would require Bradley to have managed or exercised control over some aspect of the Tolars' or Ms. SLSA or the ADA, which prohibit retaliation against any employee or any individual, whereas Title VII's retaliation provision prohibits retaliation from an employer's own, the language is his employees. I will say that in Simmons, I think Simmons would hold that the cause of action should be brought by the employee herself against the employee, not by her family members, the Tolars, so I wanted to make that distinction. Our brief sets forth the decisional authority supporting dismissal of the Tolars' claims against Bradley, but I would, of course, welcome any questions that the court may have. I don't have any, Judge Carnton, Judge Marcus. I have none, thank you. Thank you. In that case, we respectfully request that this court affirm the decision of the district court to dismiss the Tolars' retaliation claim against it. Thank you. Thank you. Mr. Greer? Yes. Let me start by responding to the Bradley-Aran arguments, particularly with regard to Underwood. Underwood is just not relevant to the inquiry that here. In Underwood, you had Mrs. Underwood being employed by one agency of the state, Mr. Underwood being employed by another agency of the state, and Mr. Underwood alleged that after his wife, I believe, complained of discrimination, he was fired because of his association with her. He never alleged that he was terminated in retaliation for his wife's conduct, that his termination was not intended as a means to retaliate against his wife. He was alleging that it was retaliation against him. That's not the Thompson situation. It's not this situation. Underwood, as interesting as it is, isn't controlling. In fact, on that point is that in Simmons, where they say, we searched and no circuit has decided the question they were addressing, they didn't cite Underwood. Underwood is out there. It is what it is, but the facts are very distinguishable from the facts here. Second, essentially the argument that Bradley-Aran is making is that law firms should be exempt from this statute if when they act as an agent of an employer and direct the conduct, which there is evidence in this record that it wasn't the bank making the decisions, it was their lawyers, that they should not be jointly held liable for that conduct. The statute, I think, very clearly describes a person as a law firm, legal organization. So law firms were included in the definitional section of a person. An employer is defined as a person who employs individuals or an agent of that employer. Clearly, a law firm is an agent of an employer, and if they participate in and engage in actively in calling the shots, they can be held liable, and that's what we're saying here. So that, I think, deals with the Underwood and the law firm question. What I would like to go back to then is on the Thompson question. Ms. Willis said that Simmons says we need to go back to the basics of Title VII, which is terms and conditions of employment. That is exactly what was rejected in Burlington Northern v. White. The retaliation provision is not intended to protect the terms and conditions. It's designed to protect the oppositional section and to make certain that people have unfettered access to the charge filing process. That's why Simpson is wrong because it's on the wrong section, and I see my time has expired. We ask that the court reverse the district court decision and remand. Thank you. Thank you very much.